1
 2026 CO 18 Amanda Brubaker, in her official capacity as the Records Custodian for the Colorado Department of Human Services, Petitioner: v. Colorado Sun and Tegna, Inc., d/b/a KUSA-TV/9News. Respondents: No. 23SC927Supreme Court of Colorado, En BancMarch 30, 2026
          
 Certiorari to the Colorado Court of Appeals Court of Appeals
 Case No. 21CA1608
 
 
          Judgment
 Reversed
 
 2
 
          
 Attorneys for Petitioner: Philip J. Weiser, Attorney General
 Jennifer L. Carty, Senior Assistant Attorney General Joseph
 G. Michaels, Assistant Solicitor General Denver, Colorado
 
 
          
 Attorneys for Respondents: Zansberg Beylkin LLC Steven D.
 Zansberg Michael Beylkin Denver, Colorado
 
 
          
 Attorney for Amicus Curiae Denver Human Services: Amy J.
 Packer Denver, Colorado
 
 3
 
          
 JUSTICE SAMOUR delivered the Opinion of the Court, in which
 JUSTICE BOATRIGHT, JUSTICE GABRIEL, and JUSTICE BLANCO
 joined. JUSTICE BERKENKOTTER, joined by CHIEF JUSTICE
 MÁRQUEZ and JUSTICE HOOD, concurs in the judgment
 only.
 
 4
 
          
 OPINION
 
 
           SAMOUR
 JUSTICE
 
 5
 
          ¶1
 United States Supreme Court Justice Louis Brandeis, one of
 the most influential jurists in American history,
 passionately defended people's privacy, going so far as
 to call an individual's "right to be let alone"
 both "the most comprehensive of rights" and
 "the right most valued by civilized men."
 Olmstead v. United States, U7 U.S. 438, 478 (1928)
 (Brandeis, J., dissenting); see Samuel D. Warren
 &Louis D. Brandeis, The Right to Privacy, 4
 Harv. L. Rev. 193, 193-220 (1890). Yet he also staunchly
 spoke out about the importance of transparency, famously
 observing that "[s]unlight is said to be the best of
 disinfectants; electric light the most efficient
 policeman." Louis D. Brandeis, What Publicity Can
 Do, in Other People's Money and How the Bankers Use
 It 92, 92 (1914). That these two compelling interests
 are inherently virtuous is beyond question. But enforcing
 them simultaneously is sometimes easier said than done.
 
 
          ¶2
 Today, we deal with media requests to the Colorado Department
 of Human Services ("CDHS") for information related
 to reports of child abuse or neglect made from state-funded
 residential child care facilities ("RCCFs"). The
 parties' dispute pits an individual's interest in
 keeping identifying information private (an interest CDHS
 seeks to defend) against the public's interest in
 transparency from government agencies (an interest the media
 seeks to foster). But we're not called upon to discern
 how to breathe life into each one of these vital interests
 without
 
 6
 
 treading on the other. No, our General Assembly took on that
 task already: It struck a delicate balance between the two
 dueling interests many years ago. Our mission today is to
 resolve the parties' disagreement by ascertaining and
 effectuating the legislature's intent in achieving that
 equilibrium.
 
 
          ¶3
 In this case, Colorado Sun and Tegna, Inc., d/b/a
 KUSA-TV/9News, (collectively the "Media
 Organizations") requested, pursuant to the Colorado Open
 Records Act ("CORA"), §§ 24-72-200.1 to
 -205.5, C.R.S. (2025), the total number of reports of child
 abuse or neglect made to local child welfare authorities from
 each of three RCCFs over a three-year period, as well as the
 number of those reports at each facility that were screened
 for investigation.[1] CDHS responded that, pursuant to section
 19-l-307(1)(a), C.R.S. (2025) ("subsection (1)(a)")
 of the Colorado Children's Code Records and Information
 Act ("Children's Records Act"), it was
 precluded from disclosing the information sought by the Media
 Organizations.[2] In particular, CDHS contended that
 providing the requested information for each of the three
 specific RCCFs would
 
 7
 
 disclose the "address of any child, family, or
 informant" contained in a report of child abuse or
 neglect, or, alternatively, would confirm that such
 a report originated from an RCCF's specific address.
 
 
          ¶4
 We ultimately conclude that CDHS must disclose the six
 cardinal numbers requested by the Media Organizations.
 Because the division remanded the case to the district court
 for factual findings instead of ordering the disclosure of
 the six requested cardinal numbers, we reverse the
 division's judgment. We remand the case to the division
 with instructions to return it to the district court for
 further proceedings consistent with this opinion.
 
 
          ¶5
 In the proceedings below, the district court perceived no
 ambiguity in subsection (1)(a) and agreed with C DHS's
 plain-meaning interpretation. It ruled that subsection (1)(a)
 barred CDHS from providing the information requested. But a
 divided division of the court of appeals saw it differently.
 Colo. Sun v. Brubaker, 2023 COA 101, ¶ 5, 542
 P.3d 1190, 1191. Finding the parties' divergent
 interpretations of subsection (1)(a) equally reasonable, the
 division cut the Gordian knot by resorting to other tools of
 statutory interpretation. Id. at ¶ 32, 542 P.3d
 at 1195. Specifically, the division considered subsection
 (1)(a)'s legislative history and the consequences of
 endorsing each party's construction. M. at ¶¶
 33-43, 542 P.3d at 1195-96. The division then concluded that
 not all addresses of children, families, or informants
 contained in reports of child abuse
 
 8
 
 or neglect are protected under subsection (1)(a); rather,
 reasoned the division, an address is exempt from disclosure
 pursuant to that statutory provision only when it constitutes
 identifying information. Id. at ¶¶ 40-41,
 542 P.3d at 1196. Stated differently, according to the
 division, some addresses do not qualify as "identifying
 information" and thus fall outside the scope of
 subsection (1)(a).
 
 
          ¶6
 In light of its interpretation, the division remanded the
 case to the district court for factual findings on whether
 the requested information "would disclose
 'identifying information' of a child, family, or
 informant associated with a child abuse or neglect
 report." Id. at ¶ 44, 542 P.3d at 1197.
 That is, the division directed the district court on remand
 to discern whether the addresses of the three RCCFs under the
 magnifying glass constitute "identifying
 information" pursuant to subsection (1)(a). Id.
 Rather than proceed with the remand, however, CDHS petitioned
 our court for certiorari review. We granted its
 petition.[3]
 
 
          ¶7
 In analyzing subsection (1)(a), we first ask whether it is
 ambiguous. Because we conclude it is not, we do not reach the
 second issue raised by CDHS's petition.
 
 9
 
 Instead, we proceed to consider whether CDHS has met its
 burden of showing that the plain meaning of the language in
 subsection (1)(a) precludes disclosure of the information
 sought by the Media Organizations' CORA requests. We
 determine that it has not.
 
 
          ¶8
 The Media Organizations asked CDHS for six cardinal
 numbers: the total number of reports of child abuse or
 neglect made to local child welfare authorities from each of
 the three specified RCCFs over a three-year period; and the
 number of those reports at each facility that were screened
 for investigation. Because CDHS has failed to satisfy its
 burden of demonstrating that the cardinal numbers requested
 constitute a "report[] of child abuse or neglect,"
 or the "name," "address," or "any
 other identifying information" of a child, family, or
 informant contained in such a report, it must disclose those
 cardinal numbers to the Media Organizations. §
 19-1-307(1)(a).
 
 
          I.
 Relevant Provisions of CORA and the Children's Records
 Act
 
 
          ¶9
 Before reciting the case's facts and procedural history,
 we hit the pause button to discuss the relevant provisions of
 CORA and the Children's Records Act. This background
 information will help place the rest of our opinion in
 context.
 
 
          ¶10
 When it enacted CORA, our General Assembly appeared to heed
 Justice Brandeis's pearls of wisdom, choosing sunlight as
 Colorado's disinfectant and electric light as
 Colorado's police officer. The legislature declared that
 this state's
 
 10
 
 public policy is that public records are generally open for
 inspection at reasonable times. § 24-72-201, C.R.S.
 (2025). The term "[p]ublic records" in CORA
 encompasses "all writings made, maintained, or kept by
 the state [or] any agency . . . for use in the exercise of
 functions required or authorized by law or administrative
 rule or involving the receipt or expenditure of public
 funds." § 24-72-202(6)(a)(I), C.R.S. (2025).
 Further, "information obtained by public agencies in the
 course of performing their duties" under the
 Children's Records Act "is considered public
 information" by CORA. See §
 19-1-302(1)(a), C.R.S. (2025). It follows that reports of
 child abuse or neglect under the Children's Records Act
 generally qualify as "public records" that must be
 accessible to the public pursuant to CORA. Indeed, on this
 much, the parties agree.
 
 
          ¶11
 Of course, rules often paint with broad strokes, and
 exceptions add the subtle detail. Any exceptions here,
 however, must be construed narrowly in light of the strong
 presumption in favor of disclosure. Shook v. Pitkin Cnty.
 Comm'rs, 2015 COA 84, ¶ 6, 411 P.3d 158, 160.
 And a records custodian asserting an exception bears the
 burden of establishing the applicability of that exception.
 Id.
 
 
          ¶12
 One of the exceptions to disclosure under CORA is an
 "inspection [that] would be contrary to any state
 statute." § 24-72-204(1)(a), C.R.S. (2025). CDHS
 relied on the exception in section 24-72-204(1) (a) in
 denying the Media
 
 11
 
 Organizations' CORA requests. The "state
 statute" identified by CDHS as being contrary to the
 Media Organizations' CORA requests was subsection (1)(a)
 of the Children's Records Act. See §
 19-l-307(1)(a). Thus, subsection (1)(a) takes center stage in
 this opinion.
 
 
          ¶13
 Subsection (1)(a), titled "Identifying information -
 confidential," states in pertinent part that
 "reports of child abuse or neglect and the name and
 address of any child, family, or informant, or any other
 identifying information contained in such reports shall be
 confidential and shall not be public information." This
 version of subsection (1)(a) has been on the books since
 1977, though it hasn't always resided at its current
 address. See Ch. 246, sec. 8, §
 19-10-115(1)(a), 1977 Colo. Sess. Laws 1020,1023. It is the
 scope of this provision that is at the nub of this matter.
 
 
          ¶14
 Our legislature enacted subsection (1)(a) to preclude the
 public disclosure of reports of child abuse or neglect and
 certain information contained in such reports. The primary
 purpose of this confidentiality provision was to
 "balance the best interests of children" and the
 "privacy interests of children and their families"
 against the "need to share information among service
 agencies and schools" and "to protect the safety of
 schools and the public at large." Id. at 1122
 (quoting § 19-1-302(2)); see § 19-10-115,
 8 C.R.S. (1973 & Supp. 1975).
 
 12
 
          ¶15
 With this background in mind, we turn to the case's facts
 and procedural history. We then proceed to analyze the merits
 of the contentions advanced by the parties.
 
 
          IL
 Facts and Procedural History
 
 
          ¶16
 CDHS is responsible for regulating private operators of RCCFs
 across the state. RCCFs are tasked with providing
 twenty-four-hour treatment and care for children who
 experience serious emotional, behavioral, or developmental
 disorders, many of whom are victims of child abuse or
 neglect. CDHS has the sole authority to initiate appropriate
 sanctions, including closure, when RCCFs fail to comply with
 the standards prescribed by Colorado law.
 
 
          ¶17
 But CDHS also has oversight of our state's abused and
 neglected children. As relevant here, CDHS is responsible for
 Colorado's child-abuse hotline, which is publicly
 advertised as a "place for reporting known or suspected
 child abuse or neglect." § 26-5-111(2)(a), C.R.S.
 (2025). Operators of RCCFs have a statutory duty to report
 known or suspected child abuse or neglect. When RCCF
 operators do so through the hotline, the hotline routes the
 complainant to the specific CDHS office responsible for
 addressing reports of child abuse or neglect in the county
 involved. Consequently, every call made to the hotline is
 reviewed by the county's CDHS office. Upon the completion
 of such review, the complaint is either "screen[ed]
 in," meaning it is assigned to a caseworker for further
 investigation, or "screen[ed]
 
 13
 
 out," meaning it is not assigned to a caseworker for
 further investigation. Dep't of Hum. Servs., 12 Colo.
 Code Regs. 2509-2:7.103-103.10 (2025).
 
 
          ¶18
 In 2017, CDHS revoked the license of one of the state's
 RCCFs, the El Pueblo Boys and Girls Ranch, in the wake of
 allegations that the staff there had abused or neglected some
 of the resident children. The Office of the Colorado Child
 Protection Ombudsman ("Ombudsman") then launched an
 investigation into the circumstances leading to the
 facility's closure and issued a report with findings
 ("CPO Report"). The CPO Report concluded that there
 was no "adequate system" in place to
 "effectively and efficiently monitor the care being
 provided to some of the state's most vulnerable
 children." Off. of Colo.'s Child Prot. Ombudsman,
 Investigation Report CPO Case ID: 2017-2736, at 3
 (Aug. 12, 2019), https:// coloradocpo.org/
 wp-content/uploads/2025/04/El-Pueblo-Boys-and
 -Girls-Ranch-Main-Report-Remediated.pdf
 [https://perma.cc/KM62-MFYN]. In fact, the CPO Report
 documented nearly 250 accounts of suspected institutional
 abuse or neglect at the El Pueblo Boys and Girls Ranch that
 had been made in the year prior to its closure. Alarmingly,
 the CPO Report noted that a majority of these matters were
 screened out without further investigation by Pueblo's
 CDHS office.
 
 
          ¶19
 A few years after the closure of the El Pueblo Boys and Girls
 Ranch, a second RCCF, the Tennyson Center, closed its
 residential program in Denver. The Ombudsman later revealed
 that Denver County officials had received more than
 
 14
 
 100 complaints regarding the facility in the prior year
 alone, and that, disturbingly, only eight of those (less than
 10 percent) were screened in and assigned for further
 investigation. See Jennifer Brown, Denver's
 Tennyson Center to Close Its Residential Program After
 Runaways, Overdoses and Child's Death, Colo. Sun
 (Mar. 23, 2021), https:/1 coloradosun.com / 2021/03/23/ tenny
 son-center-residential-program [https://perma.cc/VQ3N-2BBL],
 ¶20 In the two months following the closure of the
 Tennyson Center's residential program, the Media
 Organizations submitted formal requests under CORA for the
 following information:
 
 
 • "[A]ny documents that show how many
 calls have been made to the child abuse hotline from Mount
 Saint Vincent (RCCF) and Cleo Wallace (RCCF) from 1/1/2018 to
 3/26/2021."
 
 
 • "The number of hotline calls/abuse and
 neglect reports/runaways reports from the Tennyson Center,
 Mount Saint Vincent[,] and Cleo Wallace to local child
 welfare authorities in the last three years, and how
 many were screened in."
 
 
 (Emphases added).
 
 
          ¶21
 CDHS denied the Media Organizations' CORA requests,
 explaining that subsection (1)(a) prohibits the disclosure of
 the address of any child, family, or informant contained in
 reports of child abuse or neglect. When asked by the Media
 Organizations to reconsider, CDHS stood its ground, reasoning
 that although the requests did not actually ask for an
 address, the name of a particular RCCF was sufficient to
 identify that RCCF's address, which, in CDHS's view,
 
 15
 
 meant that the responsive information would effectively
 disclose the address of any child, family, or informant
 associated with a report of child abuse or neglect made from
 that facility. Nevertheless, CDHS offered to share with the
 Media Organizations the aggregate number of reports
 of child abuse or neglect made from all three facilities
 combined during the specified three-year timeframe, along
 with the aggregate number of those reports combined
 that were screened in and escalated for further
 investigation.
 
 
          ¶22
 After turning down CDHS's offer, the Media Organizations
 brought a lawsuit in district court under CORA seeking a
 court order to compel CDHS to produce the requested
 per-facility information. CDHS moved to dismiss for failure
 to state a claim, arguing that the plain meaning of
 subsection (1)(a)'s text barred the disclosures requested
 by the Media Organizations. The district court agreed with
 CDHS and granted the motion to dismiss, finding that the
 responsive information would violate subsection (1)(a) by
 "necessarily identifying]" the addresses of
 reported incidents. Notably, however, the district court
 acknowledged that, at least from a practical standpoint, the
 literal act of "linking specific [reports] with a
 specific case, child or informant" might be
 "difficult" or "even impossible."
 
 
          ¶23
 The Media Organizations appealed, and a division of the court
 of appeals reversed in a split decision. Brubaker,
 ¶ 5, 542 P.3d at 1191. The division homed
 
 16
 
 in on the core of the parties' dispute: the meaning of
 the statutory clause "the name and address of any child,
 family, or informant or any other identifying
 information" contained in a report of child abuse or
 neglect. Id. at ¶ 24, 542 P.3d at 1194. Because
 the division determined that this language was susceptible to
 two reasonable interpretations (those advanced by the
 parties), it concluded that subsection (1)(a) was ambiguous.
 Id. at ¶ 27, 542 P.3d at 1194.
 
 
          ¶24
 The division explained that under CDHS's reading, each
 term in the clause's series would "constitute[]
 confidential 'identifying information'": Names
 would be categorically confidential, addresses would be
 categorically confidential, and "any other identifying
 information" would operate as a catchall phrase
 encompassing additional types of identifying
 information not "specifically enumerated" (i.e.,
 identifying information other than names or addresses).
 Id. at ¶¶ 25-26, 542 P.3d at 1194.
 Conversely, observed the division, under the Media
 Organizations' reading, although subsection (1)(a)'s
 prohibition would apply to all identifying information
 contained in reports of child abuse or neglect, it would not
 apply to all names or addresses of children, families, or
 informants contained in such reports -only if those names or
 addresses constitute identifying information would they be
 barred from disclosure. Id. at ¶ 27542 P.3d at
 1194.
 
 
          ¶25
 Elaborating on the Media Organizations' construction, the
 division explained that it was rooted in a "sort-of
 reverse ejusdem generis" canon, the
 
 17
 
 much less popular cousin of "ejusdem
 generis."[4] Id. at ¶ 28, 542 P.3d at
 1195. The District of Columbia Circuit Court of Appeals
 coined the term "reverse ejusdem generis" in 1996
 in United States v. Williams-Davis, 90 F.3d 490, 509
 (D.C. Cir. 1996). See Brubaker, ¶ 28, 542 P.3d
 at 1194-95. Pursuant to this somewhat obscure rule of syntax,
 in the hypothetical phrase "A, B, or any other C,"
 the general C would not be controlled by the types of
 specific items enumerated in A and B; just the opposite: A
 and B would be subsets of, and would be controlled by, C.
 Id. Thus, only the As and Bs that are also Cs would
 be covered.[5]
 
 18
 
          ¶26
 In subsection (1)(a), then, rather than deem the phrase
 "any other identifying information" to be
 controlled and defined by the specific terms that precede it
 - "name and address" - it would control and define
 those specific terms by modifying them. Brubaker,
 ¶ 31,542 P.3d at 1195. Differently put, although the
 phrase, "any other identifying information," §
 19-l-307(1)(a), would still serve as a catchall of sorts, it
 would "reflect[] back on the more specific, rather than
 the other way around." Williams-Davis, 90 F.3d
 at 509. Using this construction, only identifying
 names and identifying addresses of a child, family,
 or informant contained in a report of child abuse or neglect
 would qualify as confidential. See id.
 
 
          ¶27
 In finding ambiguity in subsection (1)(a), the division also
 pointed to the legislature's use of the conjunctive
 "and" instead of the disjunctive or
 between "name" and "address" in the
 phrase, "the name and address of any child, family, or
 informant." § 19-1-307(1)(a); Brubaker,
 ¶ 27, 542 P.3d at 1194. The division surmised that this
 drafting choice possibly signaled that the legislature
 "did not intend for any address on its own to be
 confidential, but only addresses that are also disclosed with
 associated names" and thus constitute "identifying
 information." Id.
 
 
          ¶28
 Having landed in the ambiguity camp, the division sought to
 break the logjam by turning to two other tools of statutory
 construction-namely, subsection (1)(a)'s legislative
 history and the consequences of the competing
 
 19
 
 interpretations offered by the parties. As it relates to the
 latter tool, the division drew insight from the Tenth
 Circuit's decision in Peck v. McCann, 43 F.4th
 1116,1126 (10th Cir. 2022). Brubaker, ¶ 39, 542
 P.3d at 1196. In Peck, the court reasoned that, to
 avert constitutional infirmity, subsection (1)(a) and its
 associated penalty provisions could be construed to reach
 only "identifying disclosures." 43 F.4th at 1126.
 Steered by Peck, the division feared that CDHS's
 broader reading of subsection (1)(a) would require the
 confidentiality of certain nonidentifying information, which
 would run headlong into the First Amendment.
 Brubaker, ¶¶ 39-40, 542 P.3d at 1196. The
 division sidestepped this potential constitutional concern by
 adopting the Media Organizations' position that
 subsection (1)(a) prohibits only the disclosure of
 identifying names and addresses. Id.; see
 Peck, 43 F.4th at 1121-22.
 
 
          ¶29
 In the end, the division held, as pertinent here, that rather
 than forbid in "all circumstances" the
 disclosure of the address of any child, family, or informant
 contained in a report of child abuse or neglect, the
 legislature intended to proscribe such a disclosure only when
 the address constitutes identifying information (i.e., only
 when the address "identif[ies] a particular child,
 family, or informant associated with a child abuse or neglect
 report"). Brubaker, ¶¶ 3, 41, 542
 P.3d at 1191, 1196 (emphasis added). Thus, the division
 instructed the district court on remand to determine whether,
 under this
 
 20
 
 interpretation of subsection (1)(a), the requested
 disclosures would reveal "identifying information"
 of a child, family, or informant contained in a report of
 child abuse or neglect. Id. at ¶ 44, 542 P.3d
 at 1197. Put another way, the division directed the district
 court to decide whether the addresses of the three RCCFs in
 the crosshairs are identifying addresses pursuant to
 subsection (1)(a). Id.
 
 
          ¶30
 Judge Pawar wrote separately in dissent. She opined that
 there is only one reasonable reading of subsection (1)(a):
 The statute always protects from disclosure the name, the
 address, and any other identifying information of any child,
 family, or informant contained in a report of child abuse or
 neglect. Id. at ¶ 49, 542 P.3d at 1197 (Pawar,
 J., dissenting). Given what she perceived as the lack of
 ambiguity in the language of subsection (1)(a), she would not
 have resorted to additional aids of statutory construction.
 Id. And, effectuating the plain meaning of
 subsection (1)(a)'s language, she would have affirmed the
 district court's ruling in favor of CDHS because, in her
 view, the information sought by the Media Organizations
 "link[ed] reports of child abuse to [the three
 RCCFs'] particular addresses." Id. at
 ¶ 50, 542 P.3d at 1197.
 
 
          ¶31
 CDHS timely knocked on our certiorari door. And we opened the
 door and entered the fray.
 
 21
 
          III.
 Analysis
 
 
          ¶32
 As usual, the launching pad for our analysis is the standard
 of review. After identifying that standard, we examine the
 language of subsection (1)(a) and conclude that it is
 unambiguous. Consequently, we accord the statutory words and
 phrases their plain and ordinary meaning without consulting
 other tools of construction. We then apply our interpretation
 of subsection (1)(a) to this case. Although our statutory
 construction squares with CDHS's and Judge Pawar's,
 we ultimately run counter to their conclusion that CDHS met
 its burden of showing that subsection (1)(a) prohibits
 disclosing the six cardinal numbers requested by the Media
 Organizations.
 
 
          A.
 Standard of Review
 
 
          ¶33
 We review de novo questions of law, including those involving
 statutory interpretation. Reno v. Marks, 2015 CO 33,
 ¶ 20, 349 P.3d 248, 253. In construing a statute, we aim
 to ascertain and give effect to the legislature's intent.
 See Denver Post Corp. v. Ritter, 255 P.3d 1083, 1089
 (Colo. 2011); see also Elder v. Williams, 2020 CO
 88, ¶ 18, 477 P.3d 694, 698. Our first step in
 discerning the legislature's intent is to give statutory
 language its plain and ordinary meaning. Elder,
 ¶ 18, 477 P.3d at 698. To do so, we read such language
 in context and in accordance with the rules of grammar.
 Doubleday v. People, 2016 CO 3, ¶ 19, 364 P.3d
 193,196.
 
 22
 
          ¶34
 We are required to avoid interpretations that result in
 superfluous or meaningless words or that lead to
 "illogical or absurd results." In re People in
 Ini. of A.T.C., 2023 CO 19, ¶ 16, 528 P.3d 168,
 171; see also Archuleta v. Roane, 2024 CO 74, ¶
 9, 560 P.3d 399, 402. If the language of a statute is clear
 and we're able to decipher the legislative intent with
 reasonable certainty, we may not resort to other tools of
 statutory interpretation. Denver Post Corp., 255
 P.3d at 1089.
 
 
          B.
 Subsection (1)(a) Is Unambiguous, so We Accord Its Words and
 Phrases Their Plain and Ordinary Meaning
 
 
          ¶35
 As a refresher, here is the statutory clause that sits at the
 crossroads of the parties' positions:
 
 
 Except as otherwise provided in this section and section
 19-1-303, [C.R.S. (2025)], reports of child abuse or neglect
 and the name and address of any child, family, or informant
 or any other identifying information contained in such
 reports shall be confidential and shall not be public
 information.
 
 
 § 19-1-307(1)(a). Thus, in subsection (1)(a), our
 General Assembly chose to protect as confidential: (1)
 reports of child abuse or neglect; (2) the name of any child,
 family, or informant contained in such reports; (3) the
 address of any child, family, or informant contained in such
 reports; and (4) any other identifying information contained
 in such reports. The first category prohibits the disclosure
 of reports of child abuse or neglect (in their entirety),
 while the remaining three categories prohibit the disclosure
 of certain information contained within those reports.
 
 23
 
          ¶36
 Starting with the first category, there is nothing ambiguous
 about "reports of child abuse or neglect." Nor is
 there any ambiguity in the next two categories: the
 "name" of a "child, family, or informant"
 contained in a report of child abuse or neglect; or the
 "address" of a "child, family, or
 informant" contained in a report of child abuse or
 neglect. It follows that, in response to a CORA request, CDHS
 may not disclose a report of child abuse or neglect
 or the name or the address of a child,
 family, or informant contained in a report of child abuse or
 neglect.
 
 
          ¶37
 We recognize that subsection (1)(a) refers to "the name
 and address" of a "child, family, or
 informant" contained in a child abuse or neglect report.
 (Emphasis added). But we don't perceive the
 legislature's use of the conjunctive "and,"
 instead of the disjunctive or, between
 "name" and "address" to have the meaning
 attributed to it by the division. The legislature clearly
 intended to extend the protective mantle of subsection (1)(a)
 to both the "name" and the "address" of a
 child, family, or informant contained in a child abuse or
 neglect report. It would have been nonsensical for the
 legislature to use "or" instead of "and"
 there because then only the name or the address, but not
 both, would have been protected: "[T]he name or
 address of any child, family, or informant . . . contained in
 [child abuse or neglect] reports shall be confidential."
 
 
          ¶38
 Nor are we persuaded by the division's floated
 supposition that the legislature may have employed the
 conjunctive "and" in "the name and
 address"
 
 24
 
 to confer confidential status on an address only when paired
 with a name. Had that been the legislature's intent, it
 presumably would have explicitly stated so.
 
 
          ¶39
 That leaves the final category, "any other identifying
 information." The parties agree, as do we, that the
 plain and ordinary meaning of "identifying
 information" in this context is information that -alone
 or in conjunction with other information -is likely to either
 reveal or enable revealing the identity of a specific person.
 See generally Identify, Merriam-Webster Dictionary,
 https:// www.merriam-webster.com/dictionary/identify
 [https://perma.cc/43FS-HF7C] (defining "identify"
 in part as "to ascertain the identity of someone or
 something that is unfamiliar or unknown"). And, by using
 "any other" in front of "identifying
 information," the legislature conveyed that it
 considered both the name and the address of a child, family,
 or informant contained in a report of child abuse or neglect
 to be "identifying information." This makes sense:
 A name, whether alone or in conjunction with other
 information, is likely to either reveal or enable revealing
 the identity of a specific person. The same is true for an
 address.
 
 
          ¶40
 Viewed through the prism of the core principle requiring us
 to accord statutory language its plain and ordinary meaning,
 "any other identifying information" functions as a
 catchall category for identifying information. Put simply, in
 addition to bringing within the shield of confidentiality
 both the name
 
 25
 
 and the address of a child, family, or informant contained in
 a report of child abuse or neglect, the legislature extended
 the protective veil to all other identifying information
 contained in such a report.
 
 
          ¶41
 Under the division's approach, however, "any other
 identifying information" functions to limit the
 prohibition against disclosing either the "name" or
 the "address" of any child, family, or informant
 contained in a report of child abuse or neglect. According to
 the division, such a name or address may be disclosed under
 subsection (1)(a) if it is not identifying in nature. In
 other words, the division posited that only identifying
 names (i.e., names that qualify as identifying
 information) and identifying addresses (i.e.,
 addresses that qualify as identifying information) are
 protected by subsection (1)(a). Brubaker, ¶ 41,
 542 P.3d at 1196. But, as mentioned, this interpretation
 rests on the uncelebrated footing of reverse ejusdem generis,
 a more niche canon than its mainstream kin.
 
 
          ¶42
 Besides, under the undisputed definition of "identifying
 information," we see no daylight between a name and an
 identifying name or between an address and an identifying
 address. After all, applying the agreed-upon plain and
 ordinary meaning of "identifying information,"
 every name is "identifying information," and so is
 every address. Whether it's a name or an address, it is
 information that, alone or in conjunction with other
 information, is likely to either reveal or enable revealing
 the identity of a specific person. And, like Judge Pawar,
 
 26
 
 we think it dubious to suggest that the legislature meant to
 protect the names and addresses of children mentioned in
 reports of child abuse or neglect only in certain
 circumstances. Id. at ¶ 47, 542 P.3d at 1197
 (Pawar, J., dissenting). Regardless, if the legislature
 intended to draw a distinction between a name and an
 identifying name or between an address and an identifying
 address, and to shield from disclosure only identifying names
 and identifying addresses, it presumably would have expressly
 said so.[6]
 
 
          ¶43
 In sum, the division's interpretation is unreasonable,
 which means that subsection (1)(a) is not susceptible to two
 reasonable interpretations and is unambiguous. Because
 we're able to effectuate the legislature's intent by
 interpreting the unambiguous language of subsection (1)(a),
 attributing to each word its plain and ordinary meaning, we
 must "look no further." Carrera v. People,
 2019 CO 83, ¶ 18, 449 P.3d 725, 729. "In such a
 situation, the plain meaning rule" -the chief rule of
 statutory interpretation- "is both the first and the
 last canon and nothing more is required of the judicial
 inquiry." Id. Thus, our statutory construction
 is "at an end," Crandall v. City &Cnty. of
 Denver, 238 P.3d 659, 662 (Colo. 2010),
 
 27
 
 and all that remains is the application of our reading of
 subsection (1)(a) to decide whether CDHS has met its burden
 of demonstrating that it is prohibited from disclosing the
 six cardinal numbers requested by the Media Organizations.
 
 
          C. CDHS
 Has Failed to Show That Subsection (1)(a) Prohibits the
 Disclosure of the Six Cardinal Numbers Requested by the Media
 Organizations
 
 
          ¶44
 Our interpretation of subsection (1)(a) using the
 plain-meaning rule jibes with CDHS's. But the final
 reckoning is whether CDHS has satisfied its burden of showing
 that subsection (1)(a) precludes the disclosure of the
 information requested by the Media Organizations. We conclude
 that it has not.
 
 
          ¶45
 As noted, the Media Organizations requested six cardinal
 numbers: the total number of reports of child abuse or
 neglect made to local child welfare authorities from each of
 three RCCFs over a three-year period; and the number of those
 reports at each facility that were screened in for
 investigation. CDHS argues that disclosing the numbers
 requested would effectively make public the address
 of any child, family, or informant contained in a report of
 child abuse or neglect that originated from the Tennyson
 Center, Mount Saint Vincent, or Cleo Wallace. We're
 unpersuaded.
 
 
          ¶46
 How can the requested disclosures make public what is already
 public? That's no more possible than making public the
 information found in a book
 
 28
 
 already sitting on a library shelf. Unsurprisingly, nobody in
 this case asserts that the three RCCFs' addresses are
 secret or otherwise confidential. They aren't. These are
 public facilities with publicly accessible addresses. It
 would strain logic to pretend that the addresses of these
 RCCFs aren't already public.
 
 
          ¶47
 Still, counters CDHS, the requested cardinal numbers would
 necessarily confirm that a report of child abuse or
 neglect originated from a particular RCCF and thus from that
 RCCF's address - and by extension, from the address of a
 child, family, or informant contained in such a
 report.[7] But subsection (1)(a)'s prohibition of
 the disclosure of an address contained in a report
 of child abuse or neglect does not bar the
 confirmation of an already public address contained
 in such a report.
 
 
          ¶48
 Expanding the scope of subsection (1)(a) as CDHS urges would
 stretch that statutory provision beyond its breaking point
 and would lead to absurd results. See Educhildren ELC v.
 Cnty. of Douglas Bd. of Equalization, 2023 CO 29, ¶
 27, 531 P.3d 986, 993 (cautioning that courts must avoid
 statutory constructions "that would yield illogical or
 absurd results"); Archuleta, ¶ 9, 560 P.3d
 at 402 (same). Indeed, CDHS's approach would hinder, if
 not altogether eliminate,
 
 29
 
 oversight of state-funded residential facilities for
 children. All information, including a cardinal number, in
 any way related to a report of child abuse or neglect
 originating from an RCCF would presumably be out of bounds
 because it would confirm that such a report was made
 from the particular RCCF's address. We are aware of no
 evidence, and CDHS presents none, that this is what the
 legislature intended. To the contrary, our legislature has
 told us loud and clear that Colorado favors transparency,
 Roane, ¶ 10, 560 P.3d at 402, and we have
 therefore "narrowly construed" any "exceptions
 to the broad, general policy of [CORA]" demanding
 openness, Sargent Sch. Dist. No. RE-33] v. W. Servs.,
 Inc., 751 P.2d 56, 60 (Colo. 1988). Remember: Colorado
 is a sunlight state.
 
 
          ¶49
 Significantly, while CDHS declined to provide the six numbers
 requested by the Media Organizations, it did offer to
 disclose the aggregate number of child abuse or
 neglect reports made from all three facilities combined over
 the specified three-year period, as well as the aggregate
 number of those reports combined that were screened in
 for further investigation. CDHS undoubtedly did so because it
 determined that the disclosure of the two aggregate numbers
 would not constitute the disclosure of the address of any
 child, family, or informant contained in a report of child
 abuse or neglect - lest we presume that CDHS deliberately
 agreed to violate subsection (1)(a). We have a difficult time
 understanding why providing a per-facility breakdown of the
 same two numbers should lead to a different
 
 30
 
 outcome. In other words, if the aggregate numbers do not
 violate the prohibition in subsection (1)(a) against the
 disclosure of the address of any child, family, or informant
 contained in a report of child abuse or neglect, why do the
 per-facility numbers? Even taking CDHS's last-resort
 argument at face value, we're left to wonder why the
 per-facility numbers illegally "confirm" addresses
 covered by subsection (1)(a) but the aggregate numbers do
 not. During oral arguments, CDHS could not adequately answer
 these questions or otherwise provide any satisfactory
 justification for distinguishing between the aggregate
 numbers it offered to disclose and the per-facility numbers
 it adamantly refuses to produce.
 
 
          ¶50
 But what about the part of subsection (1)(a) that protects
 "other identifying information"? Even if, as
 we've determined, the disclosure of the cardinal numbers
 requested does not constitute the disclosure of an address,
 could they nevertheless constitute the disclosure of
 "other identifying information"? CDHS, the
 burden-bearing party, does not argue that they could, and we
 decline to overegg the pudding.
 
 
          ¶51
 Before us, CDHS's opposition to the Media
 Organizations' requests is limited to its assertions that
 disclosing the cardinal numbers in question would disclose,
 or alternatively confirm, the addresses of the three RCCFs
 and, by extension, the addresses of children, families, or
 informants contained in reports of child abuse or neglect.
 And we have nixed those contentions already. Any
 
 31
 
 argument by CDHS related to "other identifying
 information" is advanced solely in the context of
 refuting the interpretation of subsection (1) (a) championed
 by the Media Organizations and approved by the division.
 Recall that, under the Media Organizations and the
 division's approach, an agency in receipt of a CORA
 request must determine whether the disclosure (or even
 confirmation) of an address would constitute the
 disclosure of "identifying information". We,
 however, have now disavowed that construction. It follows
 that whether a cardinal number may ever constitute "any
 other identifying information" is a tomorrow problem
 that we have no occasion to pass judgment on today.
 
 
          ¶52
 To be clear, our restraint isn't borne out of a desire to
 avoid borrowing trouble. Rather, it is animated by the party
 presentation principle That principle holds parties
 responsible for framing the issues to be resolved and calls
 upon courts to be neutral arbiters as they consider any
 matters raised United States v
 Sineneng-Smith, 590 U.S. 371, 375 (2020) In general,
 our adversarial system of adjudication "is designed
 around the premise" that where, as here, parties are
 represented by competent counsel, they "know what is
 best for them, and are responsible for advancing the facts
 and argument entitling them to relief" Id. at
 375-76 (quoting Castro v United States, 540 U.S.
 375, 386 (2003) (Scalia, J, concurring in part and concurring
 in the judgment)). To put it more eloquently, courts may not
 "sally forth each day looking for wrongs to right";
 rather, they
 
 32
 
 must function as "passive instruments of
 government," wait for cases to come to them, and decide
 only questions raised by the parties. United States v.
 Samuels, 808 F.2d 1298,1301 (8th Cir. 1987) (Arnold, J.,
 concurring in the denial of rehearing en banc). Adhering to
 the party presentation principle, as we must, we cabin our
 analysis to the arguments advanced by CDHS in attempting to
 meet its burden of proof.
 
 
          IV.
 Conclusion
 
 
          ¶53
 For the foregoing reasons, we conclude that CDHS must
 disclose the six cardinal numbers requested by the Media
 Organizations. Because the division remanded the case to the
 district court for factual findings instead of ordering the
 disclosure of the six requested cardinal numbers, we reverse
 the division's judgment. We remand the case to the
 division with instructions to return it to the district court
 for further proceedings consistent with this opinion. On
 remand, the district court should address the Media
 Organizations' request for attorney fees and costs
 pursuant to section 24-72-204(5) (b), C.R.S. (2025).
 
 
          
 JUSTICE BERKENKOTTER, joined by CHIEF JUSTICE MARQUEZ and
 JUSTICE HOOD, concurs in the judgment only.
 
 33
 
          
 JUSTICE BERKENKOTTER, joined by CHIEF JUSTICE MARQUEZ and
 JUSTICE HOOD, concurring in the judgment only.
 
 
          ¶54
 I agree with the majority that section 19-l-307(1)(a), C.R.S.
 (2025), ("subsection (1)(a)") of the Colorado
 Children's Code, Records and Information Act is not
 ambiguous. Maj. op. ¶ 32. The statute always
 protects certain confidential information from disclosure:
 the name, the address, and any other identifying information
 of any child, family, or informant contained in a report of
 child abuse or neglect. § 19-1-307(1)(a).
 
 
          ¶55
 I write separately because the majority's conclusion -
 that subsection (1)(a) requires a records custodian under the
 circumstances here to nonetheless disclose an address
 contained in a report of child abuse or neglect if someone
 has already publicly disclosed it, see Maj. op.
 ¶ 47 -is inconsistent with the explicit language in the
 statute and totally at odds with the protection it affords
 children, families, and informants. See §
 19-l-307(1)(a). But that is not the only issue with the
 majority's opinion: Its conclusions regarding addresses
 that are "already public[,]" Maj. op. ¶ 46, is
 problematic; and its interpretation of subsection (1)(a) is
 unreasonable, produces illogical and absurd results, and will
 likely harm victims, families, and informants. What's
 more, even though the record reveals no public disclosures
 regarding reports of abuse or neglect concerning these two
 facilities, the majority nonetheless requires the Colorado
 Department of Human Services
 
 34
 
 ("CDHS") to confirm the existence of such reports.
 See id. at ¶¶ 45-47 49 That disclosure is
 unquestionably prohibited by subsection (1)(a).
 
 
          ¶56
 For these reasons, I would reverse the judgment of the court
 of appeals and affirm the judgment of the district court.
 That is why I respectfully concur in the judgment only.
 
 
          I.
 Subsection (1)(a) Always Protects Reports of Child Abuse or
 Neglect and the Name and Address of Any Child, Family, or
 Informant, or Other Identifying Information From Disclosure.
 
 
          ¶57
 As I have indicated, there are, in my view, multiple flaws in
 the majority's reasoning. To begin, it ignores the plain
 meaning of subsection (1)(a). It recognizes, correctly, that
 subsection (1)(a) protects as confidential the address of any
 child, family, or informant contained in a report of child
 abuse or neglect and bars the disclosure of this information.
 Id. at ¶ 35. But then it declares that these
 addresses aren't confidential after all if you can look
 them up online, thus wiping out a substantial portion of the
 protections afforded by the statute in one fell swoop.
 See id. at ¶ 47. Finally, it concludes that
 CDHS has failed to meet its burden under the Colorado Open
 Records Act ("CORA"), §§ 24-72-100.1 to
 § 24-72.4-106, C.R.S. (2025), and must disclose the
 requested records, because the cardinal numbers requested by
 Colorado Sun and Tegna, Inc., d/b/a KUSA-TV/9News
 (collectively the "Media Organizations"),
 "do[] not constitute the disclosure of an address."
 Maj. op. ¶¶ 8, 50.
 
 35
 
          ¶58
 While the majority's concerns regarding CORA's
 purposes and the need for transparency by government agencies
 (an interest the media seeks to foster) are understandable,
 see id. at ¶¶ 1-2, the majority's
 reasoning cannot be squared with subsection (1)(a).
 See § 19-l-307(1)(a). As Judge Pawar explained,
 the cardinal numbers requested by the Media Organizations
 necessarily confirm that a report of child abuse or
 neglect originated from the address of a child, family, or
 informant contained in such a report. Colo. Sun v.
 Brubaker, 2023 COA 101, ¶¶ 45-50, 542 P.3d
 1190,1197 (Pawar, J., dissenting).
 
 
          ¶59
 In concluding otherwise, the majority reads words into the
 statute that simply do not exist and ignores the words that
 do. Specifically, it disregards the language in subsection
 (1)(a) that explicitly states that this information
 "shall be confidential and shall not be public
 information." § 19-1-307(1)(a). It also disregards
 its own acknowledgment that every address is identifying
 information and that it is "dubious to suggest that the
 legislature meant to protect" sensitive information
 "mentioned in reports of child abuse or neglect only
 in certain circumstances." Maj. op. ¶ 42
 (emphasis added).
 
 
          ¶60
 The majority's interpretation is problematic because, as
 we so often observe, proper statutory interpretation requires
 that we "respect the legislature's choice of
 language." Educ. reEnvisioned BOCES v. Colo. Springs
 Sch. Dist. 11, 2024 CO 29, ¶ 32, 548 P.3d 669, 675.
 We "must avoid constructions that would render any
 
 36
 
 words or phrases superfluous or lead to illogical or absurd
 results." Id. Additionally, we must refrain
 from rewriting a statute to remedy "practical
 challenges." People v. Weeks, 2021 CO 75,
 ¶ 38, 498 P.3d 142, 154. The proper remedy for such
 practical challenges "is legislative action, not
 judicial fiat." Id.
 
 
          ¶61
 By its very terms, subsection (1)(a) prohibits the disclosure
 of "reports of child abuse or neglect and the name and
 address of any child, family, or informant or any other
 identifying information contained in such reports."
 § 19-l-307(1)(a). Nothing about this language supports
 the majority's notions regarding addresses that are
 "already public" or cardinal numbers. Maj. op.
 ¶¶ 8, 47. But see § 19-1-307(1)(a).
 Critically, the statute bars the disclosure of information
 that could be used to identify a child, family, or
 informant, not just disclosures that would identify
 a child, family, or informant. See §
 19-l-307(1)(a). This is hardly surprising as the point of the
 statute, as noted, is to always protect this
 information from disclosure to the public. Id.
 
 
          ¶62
 This is the only reasonable interpretation of the statute as
 a records custodian has no way of knowing what other
 information a requestor already has (or that they may be able
 to obtain in the future) which means the records custodian
 has no way of knowing if they might be providing the first or
 the last puzzle piece that will allow a requestor to identify
 a specific child, family, or informant. Requiring the
 disclosures that the majority does here risks making the
 
 37
 
 custodian complicit in revealing, or enabling the revealing,
 of the identity of a victim, family, or informant.
 
 
          ¶63
 Plus, if the legislature wanted to carve out an exception to
 subsection (1)(a) for addresses that were already public, it
 could have done so. E.g., Maj. op. ¶ 42
 (acknowledging that "if the legislature intended to draw
 a distinction . . . between an address and an identifying
 address, and to shield from disclosure only identifying . . .
 addresses, it presumably would have expressly said so").
 
 
          IL
 The Majority is Requiring CDHS to Confirm the Existence of
 Confidential Reports.
 
 
          ¶64
 The majority nonetheless declares that the addresses of the
 Tennyson Center, Mount Saint Vincent, and Cleo Wallace are
 all "already public." Id. at ¶ 46.
 This is so, it explains, because "[t]hese are public
 facilities with publicly accessible addresses[,]" which
 I take to mean you can easily look them up online.
 Id. But if that's the standard, what address
 isn't already public? Any way you slice it, the
 majority's opinion will leave public health departments
 across Colorado struggling to understand what they must
 disclose, potentially exposing them to awards of attorney
 fees under CORA - no matter their best efforts.
 
 
          ¶65
 More troubling still, the majority does not point to any
 published report in the record, by the Ombudsman or
 otherwise, regarding Mount Saint Vincent or Cleo Wallace.
 Unlike the Ombudsman's disclosures regarding El Pueblo
 Boys and Girls Ranch and the Tennyson Center, there are no
 public disclosures regarding
 
 38
 
 reports of child abuse or neglect originating from these
 facilities. This is why the majority is mistaken that the
 Media Organizations' CORA request is only about cardinal
 numbers.
 
 
          ¶66
 By requiring CDHS to disclose the cardinal numbers of hotline
 calls, abuse and neglect reports, and runaway reports, the
 majority is requiring CDHS to confirm the existence of such
 reports. Put differently, the majority is requiring CDHS to
 disclose confidential information to the Media Organizations
 about child abuse and neglect reports even though
 the disclosure of that information is unquestionably
 prohibited by subsection (1)(a). See §
 19-l-307(1)(a).
 
 
          III.
 The Majority's Opinion May Cause Countless Tomorrow
 Problems.
 
 
          ¶67
 Additionally, the majority's interpretation is
 unreasonable and produces absurd and illogical results.
 Moreover, it has the potential to cause great harm to
 victims, families, and informants. The majority claims that
 questions about the reach of its holding regarding cardinal
 numbers are "a tomorrow problem." Maj. op. ¶
 51. This might be accurate as it relates to our court, but
 not so for the public health departments, media outlets, and
 trial courts that will have to discern just what the majority
 opinion means.
 
 
          ¶68
 Questions will inevitably arise about how far the
 majority's rationale extends. If it is applied to victims
 of abuse or neglect, those victims may lose their protection
 under the statute if their names have already been made
 public, so long
 
 39
 
 as the CORA request purports to be limited to the cardinal
 number of reports regarding the victim. See id. at
 ¶¶ 45-47, 49. Releasing information about the
 number of times a victim's name appears in reports of
 abuse or neglect hardly aligns with the General
 Assembly's intent to protect victims. See §
 19-1-302(1)(a), (2), C.R.S. (2025).
 
 
          ¶69
 Similarly, if the majority's approach is extended to
 informants, it may cause informants, especially those who are
 not subject to Colorado's mandatory reporting scheme,
 see § 19-3-304(2), C.R.S. (2025), to hesitate
 to report abuse and neglect. Concerned neighbors and family
 members may be reluctant to become involved if they can so
 readily lose their anonymity in reporting. See, e.g.,
 Pennsylvania v. Ritchie, 480 U.S. 39, 60 (1987)
 ("Relatives and neighbors who suspect abuse also will be
 more willing to come forward if they know that their
 identities will be protected."); Watso v. Colo.
 Dep't of Soc. Servs., 841 P.2d 299, 307, 308-09
 (Colo. 1992) (describing that safeguards, such as
 confidentiality, under the Child Protection Act protect
 children and promote "alacrity in reporting" child
 abuse).
 
 
          ¶70
 And if all it takes for an informant to lose some of the
 protections of subsection (1)(a) is a public address and a
 CORA request asking for a cardinal number, as here, will
 mandatory reporters, like employees at schools, childcare
 
 40
 
 centers, and hospitals serving children, also lose some of
 their protections under the statute? It is hard to imagine
 that this is what the legislature had in mind.
 
 
          ¶71
 Simply put, in addition to being unreasonable and producing
 absurd and illogical results, the majority's opinion has
 the potential to cause victims great harm and to create
 countless "tomorrow problem[s,]" Maj. op. ¶
 51, raising significant questions about what protections for
 vulnerable populations will remain in its wake. Educ.
 reEnvisioned, ¶ 32, 548 P.3d at 675 (explaining
 that, in interpreting a statute, "we must avoid
 constructions that would . . . lead to illogical or absurd
 results").
 
 
          IV.
 Conclusion
 
 
          ¶72
 In sum, the majority fails to follow the plain language and
 obvious intent of subsection (1)(a). Its reasoning regarding
 public addresses is similarly strained, and its
 interpretation of subsection (1)(a) is unreasonable, produces
 illogical and absurd results, and will likely harm victims,
 families, and informants.
 
 
          ¶73
 Worse still, the majority overlooks the fact that there are
 no published reports by the Ombudsman, or anyone for that
 matter, concerning Mount Saint Vincent or Cleo Wallace,
 meaning that if reports of child abuse or neglect
 originated from these facilities, there has been no public
 disclosure of those facts. Consequently, by requiring CDHS to
 disclose the cardinal numbers of hotline calls, abuse and
 neglect reports, and runaway reports for Mount Saint Vincent
 and
 
 41
 
 Cleo Wallace, the majority is requiring CDHS to confirm the
 existence of such reports. This
 disclosure is unquestionably prohibited by subsection (1)(a).
 
 
          ¶74
 For all these reasons, I would reverse the judgment of the
 court of appeals and affirm the judgment of the district
 court. Because the majority's holding also calls for
 reversal of the division below, I concur in the judgment
 only.
 
 
 ---------
 
 
 Notes:
 
 
 [1] The Media Organizations' requests
 referred to reports of child abuse or neglect, as well as
 to calls to the child abuse hotline and reports of
 runaways. Because child-abuse hotline calls and reports
 of runaways fall under the umbrella of reports of child abuse
 or neglect, we, like the parties, generally refer to reports
 of child abuse or neglect when discussing the Media
 Organizations' requests.
 
 
 [2] Subsection (1)(a) prohibits the
 disclosure of "reports of child abuse or neglect and the
 name and address of any child, family, or informant or any
 other identifying information contained in such
 reports."
 
 
 [3] We agreed to review the following two
 issues:
 
 
 1. Whether the court of appeals erred as a matter of
 law in concluding that section 19-l-307(1)(a), C.R.S. (2023),
 is ambiguous.
 
 
 2. Whether, if the court of appeals correctly
 concluded that section 19-1-307(1) (a) is ambiguous, it erred
 in concluding the legislative history and Peck v.
 McCann, 43 F.4th [1116] (10th Cir. 2022), support its
 interpretation of the statute.
 
 
 [4] "Ejusdem generis," Latin for
 "of the same kind," Jay Wexler, Fun With
 Reverse Ejusdem Generis, 105 Minn. L. Rev. 1,1 (2020),
 is a canon of statutory construction that instructs that
 "a 'general or collective term' at the end of a
 list of specific items" is typically
 "'controlled and defined by reference to' the
 specific classes . . . that precede it," Fischer v.
 United States, 603 U.S. 480, 487 (2024) (omission in
 original) (quoting Sw. Airlines Co. v. Saxon, 596
 U.S. 450,458 (2022)). Pursuant to this canon, general words
 or phrases following a list of specific articles are
 interpreted to include only items of the same kind
 as those specifically listed. See People v. Sims,
 2020 COA 78, ¶ 23, 474 P.3d 189,194. For example,
 "the phrase 'other foods' in a provision
 covering 'apples, bananas, grapes, oranges, and other
 foods' would likely refer only to fruits that are not
 apples, bananas, grapes, or oranges." Wexler,
 supra, at 1. So, in this case, the canon would
 require "any other identifying information" to
 refer to identifying information that is not names or
 addresses. Here, however, the division used a
 reverse version of this canon.
 
 
 [5] Unlike the canon of ejusdem generis,
 which "has a long and storied history in the law, has
 been used by judges in countless cases, and has been the
 subject of a large body of scholarly commentary over the
 years," its mirror-image canon (i.e., its reverse
 version) "is far less well known and understood,"
 "didn't even have a name until the mid-1990s,"
 and had "been the subject of absolutely no scholarly
 commentary at all" before November 2020. Wexler,
 supra, at 1-2 (footnotes omitted).
 
 
 [6] We disagree with the division that the
 interpretation we embrace today will require certain
 nonidentifying information to be kept confidential. As
 we've made clear now, either a name or an address will
 always constitute identifying information. Thus,
 there is no risk of keeping confidential any nonidentifying
 information, and the constitutional concerns raised by the
 Tenth Circuit in Peck, while valid, are simply
 inapposite here. 43 F.4th at 1125-26.
 
 
 [7] Judge Pawar likewise concluded, in
 summary fashion, that the cardinal numbers requested would
 "link[] reports of child abuse to [the RCCF's]
 particular addresses." Brubaker, ¶ 50, 542
 P.3d at 1197 (Pawar, J., dissenting).
 
 
 ---------